Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| W.B., individually and on behalf of A.B. a minor,<br><br>             Plaintiff,<br><br>vs.<br><br>HCA HEALTHCARE INC., BEACON HEALTH OPTIONS, INC. and the HCA HEALTH and WELFARE BENEFITS PLAN.<br><br>             Defendants. | AMENDED COMPLAINT<br><br>Case No. 2:21-cv-00641-JCB |

Plaintiff W.B. individually and on behalf of A.B. a minor, through her undersigned

counsel, complains and alleges against Defendants HCA Healthcare Inc, ("HCA") Beacon

Health Options, Inc. ("Beacon") and the HCA Health and Welfare Benefits Plan ("the Plan") as

follows:

## PARTIES, JURISDICTION AND VENUE

1.  W.B. and A.B. are natural persons residing in Orange County, Florida. W.B. is A.B.'s

    mother.

2. HCA is an healthcare company based out of Nashville, Tennessee and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. HCA delegated the administration of the Plan's mental health claims to Beacon. Beacon is a behavioral health company based in Massachusetts and is a subsidiary of Anthem Inc.

4. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). W.B. was a participant in the Plan and A.B. was a beneficiary of the Plan at all relevant times.

5. A.B. received medical care and treatment at Change Academy Lake of the Ozarks ("CALO") beginning June 1, 2019.[1] CALO is a licensed residential treatment facility located in Missouri, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. CALO specializes in the treatment of adolescents with attachment disorders.

6. Beacon denied claims for payment of A.B.'s medical expenses in connection with her treatment at CALO.

7. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Defendants do business in Utah and across the United States. HCA has a significant business presence in

---

[1] This lawsuit seeks recovery for A.B.'s treatment at CALO between her admission on June 1, 2019, and December 31, 2019. Although A.B. remained in treatment beyond these dates, W.B. switched to a different insurer from January 1, 2020 forward.

Utah as it is the parent company of MountainStar Healthcare, which describes itself as "an integrated system of hospitals, physician clinics and outpatient centers that is making healthcare more accessible and convenient all along the Wasatch Front."[2] In addition, venue in Utah will save W.B. costs in litigating this case. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### A.B.'s Developmental History and Medical Background

10. A.B. was adopted by W.B. around the time that she was seven months old. A.B.'s previous living environment was neglectful, and she was frequently left alone and exposed to cigarette smoke.

11. A.B. was often restless and was easily frustrated, she would often scream for extended periods of time and was frequently very defiant. Shortly after starting daycare, W.B. was told that A.B. appeared to have emotional problems. W.B. placed A.B. in multiple types of therapy but nothing seemed able to effectively treat all of her symptoms. A.B.'s primary therapist diagnosed her with Reactive Attachment Disorder.

---

[2] https://mountainstar.com/about/ (accessed November 5, 2021.)

12. Despite A.B.'s therapy being a covered service, W.B. had frequent difficulties getting Beacon to pay for it.

13. A.B. threw frequent long-lasting tantrums which made it difficult to take her anywhere public like a restaurant. A.B. would often become physically aggressive and would need to be restrained during these episodes. The family got in the habit of taking two cars when going anywhere as A.B. needed to be brought home so frequently.

14. Oftentimes A.B.'s impulsivity caused her to engage in dangerous behaviors such as opening the car door on the interstate. When A.B. became upset, she would often react by attacking the person who had upset her.

15. A.B.'s father often received calls to come pick her up early from school due to her behaviors. A.B. met with a psychologist and started taking medications. Initially these helped somewhat, but they became much less effective after only a few weeks. Despite numerous attempts A.B. was never able to attain the same benefit from her medications and they often had unwanted effects such as making her very tired.

16. A.B. started attending a private school which attempted to accommodate her, but when the school year ended, she was told that she could not return. On one occasion, A.B. shoved her grandmother (who had back problems) from behind after getting into a fight over bedtime. After this, A.B. was enrolled in a therapeutic summer program.

17. While A.B. was out of the house in inpatient care, W.B. realized the harm A.B.'s behaviors had on the rest of the family, particularly on her brother. A.B. would often hit her brother and stole his belongings often enough that W.B. had to put a lock on his door.

18. A.B. was given a psychological evaluation and was diagnosed with Reactive Attachment Disorder, Oppositional Defiant Disorder, Attention-deficit Hyperactivity Disorder, Social

Anxiety Disorder, and Persistent Motor Tic Disorder, as well as symptoms of separation anxiety.

19. A.B. was resistant to treatment and either behaved aggressively or made false claims of abuse in an attempt to avoid it. A.B. was discharged from her treatment program with the recommendation that she continue inpatient treatment in another environment. A.B. started attending another program which specialized in treating adopted children and those with behavioral problems.

20. A.B. continued to act out aggressively and would do things like kick others or grab the steering wheel of a moving car and she frequently had to be restrained. W.B. placed A.B. in another program called Brain Balance which Beacon similarly refused to cover. Beacon provided no advisory assistance to let W.B. know the programs it would cover.

21. A.B. was kicked out of the program she was attending and was then sent to an outdoor behavioral health facility called Trails Carolina. W.B. contacted Beacon to inform it of A.B.'s pending admission to Trails, but despite this outreach, Beacon denied payment for Trails on the grounds that it had not been preauthorized.

22. At Trails, A.B. received another neuropsychological evaluation and was additionally diagnosed with Disruptive Mood Dysregulation Disorder. A.B. was discharged prematurely from Trails after completing two-thirds of the program because her behavior was negatively impacting her peers to such an extent that the program decided to discharge her early.

**CALO**

23. Following her premature discharge from Trails, A.B. was admitted to CALO on June 1, 2019.

24. In a letter dated July 24, 2019, Beacon approved coverage for A.B.'s treatment for dates of service May 1, 2019, to June 1, 2019.

25. In a letter dated August 6, 2019, Beacon denied further payment for A.B.'s treatment under the justification that:

> You are a 14-year-old female admitted to residential mental health treatment on 04/25/19, due to symptoms of depression and anxiety. You were treated with individual and milieu therapies along with medications. Your symptoms improved. You were interacting appropriately with others and did not have any behavioral or mental health concerns that required continued treatment with 24 hour a day support. Therefore, as of 06/01/19, it was not medically necessary to manage your symptoms with residential mental health treatment. Your care could have been safely addressed with a partial hospitalization mental health treatment, which typically meets 5 days a week, for 6 hours a day.

26. In a letter dated December 27, 2019, Beacon upheld the denial of payment for A.B.'s treatment under the grounds that "THE INFORMATION REQUIRED TO PERFORM THE RETROSPECTIVE REVIEW REQUESTED HAS NOT BEEN RECEIVED." (emphasis in original)

27. On January 30, 2020, A.B.'s father appealed the denial of payment for A.B.'s treatment. He wrote that A.B. had been in treatment since she was four years old and that due to safety concerns such as constant physical aggression or actions which put the family's safety in danger, she had not been able to be treated at home.

28. A.B.'s father argued that he had spoken with Beacon many times over the years and they had never been cooperative. He stated that they had not given him assistance with finding treatment, they often told him that someone would "get back to him" later only to never follow up, had not provided him with a concrete treatment plan, and despite allegedly having many in-network providers, there were somehow none within a few hundred miles of their home.

29.  He wrote that when he called to discuss A.B.'s previous treatment at Trails Carolina and asked what he needed to do for care to be approved, he was not told that he needed to obtain precertification until A.B. arrived at Trails and her care was denied for that reason.

30. He voiced his frustration that despite asking Beacon for several months where A.B. could receive care, it had refused to respond. He asked how he could keep A.B. safe in an outpatient environment if she did something dangerous like she had in the past such as grabbing the steering wheel of a moving car and caused serious harm. He questioned, "What will you do for us then? Apologize?" (emphasis in original)

31. He stated that A.B. was making progress at CALO and that it was a well-run organization. He wrote that he expected Beacon to provide the coverage necessary so that A.B. could be treated effectively and be able to come home safely.

32. In a letter dated July 16, 2020, Beacon upheld the denial of payment for A.B.'s treatment. The letter stated in pertinent part:

> Beacon clinical rationale for this decision is: [sic] You are a 15-year-old female for whom residential mental health treatment was requested on 07/01/2019, due to behavioral concerns. You were exhibiting behaviors that included swearing, bullying peers, teasing, and intimidating others. Based on the provided information, you were admitted on 04/25/2019, and this review is for dates of service 07/01/2019 and beyond. As of 07/01/2019, you were calm, had a good appetite, your memories were intact and your thoughts were clear. You were taking your medications and were exhibiting less [sic] behavioral concerns. Therefore, as of 07/01/2019, it was not medically necessary to manage your symptoms with residential mental health treatment. Your care could have been safely addressed with partial hospitalization mental health treatment, which typically meets 5 days a week, for 6 hours each day, located in your home area where you could have addressed situational and emotional stressors in a real world setting, which is essential to maintain progress. Additionally, please be advised that Beacon has no medical records on file for dates of service 06/01/19 to 06/30/19, and 08/01/19 to 12/31/19, in order to complete a full medical necessity review, records would be required. You may submit the members [sic] medical records to Beacon for consideration…

33. On October 8, 2020, W.B. submitted a level two appeal of the denial of payment for A.B.'s treatment. She reminded Beacon that she was guaranteed certain protections under ERISA including a full, fair, and thorough review which took into account all of the information she provided, which utilized appropriately qualified reviewers, which gave a clear response referencing the specific plan provisions on which the denial was based, and which gave her the information necessary to perfect the claim.

34. W.B. expressed concern that Beacon had violated generally accepted standards of medical practice in its denial and through the criteria it utilized. She referenced a court decision in *Wit et.al., v United Behavioral Health* in which the court found an insurer's proprietary clinical guidelines to violate generally accepted standards of medical practice on several counts, including:

   a. Overemphasizing acuity and crisis stabilization over effective treatment of the patient's underlying condition.
   b. Failing to address the effective treatment of co-occurring conditions.
   c. Failing to err on the side of caution in favor of a higher level of care when there is ambiguity and pushing patients to lower levels of care where such a transition is safe even if the lower level of care is likely to be less effective.
   d. Precluding coverage for treatment to maintain level of function
   e. Precluding coverage based on lack of motivation.
   f. Failing to address the needs of children and adolescents to receive intensive treatment over a sustained period of time.
   g. Using an overly broad definition of "custodial care" along with overly narrow definitions of "active" treatment and "improvement."
   h. Imposing mandatory prerequisites rather than using a multidimensional approach.

35. W.B. argued that Beacon engaged in many of the same practices the court had found to be impermissible in *Wit*. She pointed out that for instance, Beacon did not have criteria for children and adolescents despite the fact that their treatment needs were significantly different from those of adults, and it did not take into account the multidimensional factors leading to A.B.'s treatment including her comorbid conditions.

36. W.B. contended that it was disingenuous to take A.B.'s conditions such as Reactive
    Attachment Disorder, Attention-deficit Hyperactivity Disorder, and Disruptive Mood
    Dysregulation Disorder and reduce them to innocent sounding terms such as "swearing,
    bullying peers, teasing, and intimidating others." She classified these descriptions as
    misleading and inappropriate.

37. W.B. shared a research article on reactive attachment disorder which showed that it was a
    particularly difficult condition to treat with few effective remedies. According to the
    article one of the few clinically appropriate treatment methodologies for this condition
    was dyadic developmental therapy. She contended that CALO was one of the few
    providers available that was able to offer specialized treatment such as this or Dialectical
    Behavioral Therapy for Reactive Attachment Disorder treatment.

38. She protested Beacon's use of factors such as A.B. being calm, taking her medications,
    and having a good appetite as justifications for denying care. She accused Beacon of
    using "superficial signs of progress" to push patients into a lower level of care. She
    argued that after Beacon had approved thirty days of treatment it had denied further care
    based solely on preconceived notions of how long treatment should last rather than
    A.B.'s individual needs.

39. W.B. wrote that she was not aware of any partial hospitalization programs in the entire
    country which could effectively treat Reactive Attachment Disorder, much less any
    programs in her service area. She reminded Beacon that treatment needed to not only be
    safe, but also effective for any benefits to be gained.

40. W.B. quoted the definition of medically necessary care found in the Plan document and
    argued that A.B. met this definition. She reiterated that CALO was the safest, most

effective, and most appropriate level of care at which W.B. could be treated given her history, especially given her history of regression and escalating behaviors in lower levels of care.

41. W.B. contended that Beacon's denial violated MHPAEA through the application of treatment limitations on mental healthcare which it did not equally apply to analogous medical or surgical services. W.B. identified skilled nursing, inpatient rehabilitation, and hospice facilities as some of the medical or surgical analogues to the treatment A.B. received.

42. W.B. identified two specific ways in which she alleged Beacon violated MHPAEA. She pointed out that Beacon had required A.B. to satisfy requirements enumerated only in proprietary criteria. She noted that not only were medical or surgical services like skilled nursing care not subject to these requirements, but Beacon did not appear to have proprietary criteria for these services at all.

43. She contended that requiring behavioral health providers to meet requirements set forth in proprietary criteria while exempting medical or surgical providers from this same mandate was "a blatant disparity" and was a non-quantitative treatment limitation prohibited by MHPAEA.

44. The second example of a violation of MHPAEA identified by W.B. was Beacon's requirement of acute level symptoms such as harm to self or others in order to qualify for residential treatment care. W.B. accused Beacon of intentionally limiting the availability of residential treatment care by placing requirements which were strictly contrary to generally accepted standards of medical practice.

45. W.B. alleged that Beacon did not require individuals receiving intermediate level medical facilities like skilled nursing care to be suffering from acute level symptoms before their treatment was approved.

46. W.B. asked that a parity analysis be performed on the Plan to ensure that it was in compliance with MHPAEA. She not only asked for the results of this analysis, but also physical copies of any and all documentation used.

47. W.B. argued that A.B.'s treatment was medically necessary and included letters of medical necessity with the appeal. In a letter dated August 13, 2019, A.B.'s psychiatrist Kristina Kise, MD, wrote in part:

> [A.B.] is a current patient of mine. I have treated her since 10-17-18. I have diagnosed her with Reactive Attachment Disorder, Conduct Disorder, and Unspecified Anxiety Disorder. I recommended more intensive treatment such as a Residential Treatment Center in January 2019. I also made the recommendation that a transport service be used to safely get [A.B.] to treatment as [A.B.] has a history of violence. Please contact me if you have any questions or concerns.

Teresa Guerard, LMHC, wrote in a letter dated August 18, 2020:

> My name is Teresa Guerard. I am a Licensed Mental Health Counselor in Florida and I specialize in the assessment, diagnosis and treatment of attachment issues. Attachment problems occur when the child's basic needs are not met consistently in a timely and appropriate manner during early life. As a result of this maladaptive treatment, a child develops a faulty belief system, or internal working model. For the child with attachment disorder, their internal model has become: I trust only myself – adults cannot be trusted; the world is a dangerous place so I must be in control of everyone and everything in my environment in order to feel safe; and there is something inherently wrong with me that caused my birth mother to not love and care for me in an appropriate manner. As a result of this belief system, the child's decision making process becomes: I will do whatever I have to do to get what I want, regardless of the consequences to myself or others.
>
> [A.B.] is one such child. In spite of my best efforts over the years, I was unable to overcome the faulty internal model through which [A.B.] functioned. …
>
> Her diagnosis at the time of discharge from my services were Reactive Attachment Disorder and Oppositional Defiant Disorder with a strong likelihood

of being Borderline, Antisocial and/or Narcissistic Personality Disordered as an adult, if more effective, appropriate treatment was not found for her.

Anna Edwards, Ph.D. wrote in a Neuropsychological Examination dated March 21, 2019:

> After her placement at Trails, it is recommended that [A.B.] continue to receive treatment in structured and therapeutically supportive residential setting such as a residential treatment center. [A.B.] will need a highly structured and therapeutically supportive residential setting such as a residential treatment center. [A.B.] will need a highly structured and supportive therapeutic program with a positive peer culture where she can increase feelings of self-efficacy, stabilize emotionally and behaviorally, and learn to cope in a more adaptive manner.

48. W.B. noted that the medical professionals who had worked with A.B. on a firsthand basis recommended that she receive residential treatment. She asked Beacon to elaborate on what basis it disagreed with the assessments and recommendations of the highly trained clinical professionals who "actively saw the deterioration and treatment of [A.B.'s] conditions."

49. W.B. included copies of A.B.'s medical records with the appeal. These records showed that A.B. continued to struggle with behaviors such as, physical aggression, including attacks toward staff and peers, self-harming, suicidal ideation, refusal to eat, hypervigilance, screaming for hours on end, being placed on safety status, separation status, and closeness status, negative self-image, self-sabotaging, running from the program, sexually acting out, paranoia, and forging signatures. A.B. exhibited these symptoms even in the controlled environment of a residential treatment facility.

50. W.B. stated that she would not have taken on the emotional and financial burden of sending A.B. to CALO if there were any viable alternatives. She asked in the event Beacon maintained the denial that it provide her with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any

administrative service agreements that existed, any guidelines or criteria utilized in the

determination as well as their medical/surgical equivalents, including the criteria for

mental health, substance use, skilled nursing, inpatient rehabilitation, and hospice, as well

as any reports or opinions regarding the claim from any physician or other professional,

along with the names, qualifications, and denial rates of the individuals who reviewed the

claim, or were consulted about the claim. (collectively the "Plan Documents")

51. W.B. asked that if Beacon did not possess the Plan Documents or was not acting on

behalf of the plan administrator in this regard that it forward her request to the

appropriate entity.

52. In a letter dated October 23, 2020, Beacon upheld the denial of payment for A.B.'s

treatment. The letter indicated that it was a response to a level one appeal and gave the

following justification for upholding the denial:

> You are a 15-year-old female for whom admission was requested to residential
> mental health treatment on 04/25/2019, due to symptoms of depression and
> anxiety. You were treated with individual and milieu therapies, as well as the
> medications clonidine and risperidone. You were in control of your behaviors.
> Your family is supportive. You did not have any behavioral or mental health
> concerns that required 24-hour a day support. On 06/01/2019, it was not
> medically necessary for your symptoms to be managed in with residential mental
> health treatment. Your care could have been safely addressed in a less restrictive
> level of care, such partial [sic] hospitalization mental health treatment, which
> typically meets 5 days a week, for 6 hours each day.
>
> This decision is based on Beacon Health Options Medical Necessity Criteria
> 2.202.05, for Residential Treatment Services (RTS).
>
> This determination is further based on the design of your benefits plan as outlined
> in the Summary Plan Description for your benefit plan. The Summary Plan
> Description is provided by your employer.
>
> You are entitled to receive, upon request and at no charge, the documents, records
> and information related to this claim. This includes any internal protocols or rules
> used in making this determination as well as an explanation of the medical,
> scientific or clinical judgement applied in this case.

53. Beacon had already responded to W.B.'s level one appeal in a letter dated July 16, 2020. It is unclear why Beacon issued another response to the level one appeal on October 23, 2020. In addition, the October 23, 2020, letter contained appeal information for submitting a level two appeal, even though W.B. had already done so and no longer had the option according to the insurance policy.

54. In a letter dated October 28, 2020, Beacon upheld the denial of payment for A.B.'s treatment. This letter indicated it was a response to a level two appeal and gave the following justification for the denial:

> You are a 15-year-old female for whom admission was requested to residential mental health treatment on 04/25/2019 due to mood swings, concerns with your behavior, and anger. You were exhibiting behaviors that included swearing, teasing, and intimidating others. You were treated with group and individual therapies, as well as medication. The information provided does not indicate that you had any behavioral or mental health concerns that required 24-hour a day support. Therefore, as of 07/01/2019, it was not medically necessary for your symptoms to be treated with residential mental health treatment. Your care could have been safely addressed in a lower level of care, such as partial hospitalization mental health treatment, which typically meets 5 days a week, for 6 hours each day.
>
> This decision is based on Beacon Health Options Medical Necessity Criteria 2.202.05, for Residential Treatment Services (RTS).
>
> This determination is further based on the design of your benefits plan as outlined in the Summary Plan Description for your benefit plan. The Summary Plan Description is provided by your employer.
>
> You are entitled to receive, upon request and at no charge, the documents, records and information related to this claim. This includes any internal protocols or rules used in making this determination as well as an explanation of the medical, scientific or clinical judgement applied in this case.

55. In a letter dated November 18, 2020, W.B. responded to the above two denial letters. W.B. wrote that she felt it necessary to clarify that her level one appeal had been submitted on January 30, 2020, and her level two appeal on October 8, 2020. As

Beacon's extra letter introduced yet another element of uncertainty into the appeals process, W.B. stated that she was writing this letter to clarify that the appeals process had been exhausted and she intended to rectify Beacon's denial of payment through litigation.

56. The Plaintiff exhausted her pre-litigation appeal obligations under the terms of the Plan and ERISA.

57. The denial of benefits for A.B.'s treatment was a breach of contract and caused W.B. to incur medical expenses that should have been paid by the Plan in an amount totaling over $135,000.

58. Beacon failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of W.B.'s requests, and despite its assurances in the denial letters that such information would be provided upon request.

### **FIRST CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

59. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Beacon, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

60. Beacon and the Plan failed to provide coverage for A.B.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

61. ERISA also underscores the particular importance of accurate claims processing and

evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiff in the pre-litigation appeal process. 29 U.S.C. §1133(2).

62. The denial letters produced by Beacon do little to elucidate whether Beacon conducted a meaningful analysis of the Plaintiff's appeals or whether it provided them with the "full and fair review" to which they are entitled. Beacon failed to substantively respond to the issues presented in W.B.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process.

63. As Beacon approved exactly one month of treatment, W.B. alleged that Beacon had denied A.B.'s claims based on a predetermined expectation of how long treatment was expected to last, rather than any other factors such as medical necessity. W.B. provided evidence in the form of medical records and letters of medical necessity that A.B.'s treatment remained medically necessary, however Beacon provided little to no evidence that it considered any of W.B.'s arguments.

64. Beacon and the agents of the Plan breached their fiduciary duties to A.B. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in A.B.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of A.B.'s claims.

65. The actions of Beacon and the Plan in failing to provide coverage for A.B.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

//

16

//

//

//

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

66. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Beacon's fiduciary duties.

67. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

68. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

69. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

70. The medical necessity criteria used by Beacon for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

71. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for A.B.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Beacon exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

72. When Beacon and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. Beacon and the Plan evaluated A.B.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

73. W.B. identified two primary examples in which she alleged Beacon had violated MHPAEA. The first was a requirement that residential treatment centers satisfy requirements enumerated only in proprietary criteria. W.B. stated that not only were intermediate level medical and surgical services exempted from these requirements, but Beacon did not appear to have proprietary criteria for these services at all.

74. W.B. cited to the court decision in *Wit* to document that another insurer's proprietary criteria had been found to violate generally accepted standards of medical practice when it utilized many of the same practices employed by Beacon.

75. The second example W.B. offered of the disparate application of medical necessity criteria between medical/surgical and mental health treatment, was the use of acute medical necessity criteria to evaluate the non-acute treatment that A.B. received and its requirement that A.B. pose a danger to self or others.

76. W.B. contended that Beacon had deliberately imposed these restrictions on A.B.'s treatment to have a plausible justification for denying payment after a predetermined amount of time had passed. She directed Beacon to evaluate the Plan's MHPAEA compliance, but Beacon refused or failed to do so.

77. As another example of the Plan's improper application of its criteria to evaluate the treatment A.B. received, the level of care applied by Beacon failed to take into consideration the patient's safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

78. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Beacon, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and

more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

79. Beacon and the Plan did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that Beacon and the Plan were not in compliance with MHPAEA.

80. The violations of MHPAEA by Beacon and the Plan are breaches of fiduciary duty and also give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiff as make-whole relief for her loss;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiff for her loss arising out of the Defendants' violation of MHPAEA.

81. In addition, W.B. is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for A.B.'s medically necessary treatment at CALO under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 8th day of November, 2021.

By ____s/ Brian S. King_____
Brian S. King
Attorney for Plaintiff

County of Plaintiff's Residence:
Orange County, Florida